**FILED**

DEC - 6 2002

LARRY W. PROPES, **CLERK**
COLUMBIA, S.C.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ORANGEBURG DIVISION**

|  |  |  |
|---|---|---|
| Charleston Aluminum Trading Co., LLC, | ) ) ) | C/A No.: _____ Common Pleas No.: 02-CP- |
| Plaintiff, | ) ) |  |
| vs. | ) ) ) | **DEFENDANTS'S MEMORANDUM OF LAW IN SUPPORT OF ITS** |
| Sibirsky Aluminum Products USA Corp., | ) ) ) | **MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12 (b)(6) AND TO COMPEL** |
| Defendant. | ) ) ) | **ARBITRATION** |

5 02 4090 24

Defendant Sibirsky Aluminum Products USA Corp. ("SAP") respectfully submits

this memorandum of law in support of its motion to dismiss Plaintiff's Complaint (the "Com-

plaint") pursuant to Rules 12(b)(1) and 12 (b)(6) of the Federal Rules of Civil Procedure and

to compel arbitration or, in the alternative, stay further judicial proceedings pending the out-

come of arbitration.

## I. INTRODUCTION

Plaintiff Charleston Aluminum Trading Co., LLC ("Charleston") has brought this

action notwithstanding its agreement with SAP to arbitrate any such disputes. Accordingly,

federal law and Supreme Court precedent mandates that this Court, at a minimum, stay this

action under Section 3 of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). In

this case, however, dismissal of the Complaint, rather than a stay, is warranted.

## II. STATEMENT OF FACTS

As alleged in the Complaint, over the past two years SAP and Charleston have engaged in a business relationship in which Charleston has purchased aluminum products from SAP. (Complaint ¶ 4). During the course of this business relationship, certain issues have arisen between SAP and Charleston. On June 21, 2002, SAP and Charleston entered into an agreement (the "June 21 Agreement") in an "effort to resolve the outstanding issues" between them at that time. (Markowitz Aff. ¶ 5 and Ex. A.). To that end, the June 21 Agreement sets forth various terms and conditions with respect to payment and delivery of Charleston's outstanding orders for the purchase of aluminum pursuant to several purchase orders, all of which are explicitly referenced in the June 21 Agreement. (Markowitz Aff. ¶ 6 and Ex. A.).

In addition, the June 21 Agreement contemplated that SAP would accept an additional purchase order from Charleston that had previously been rejected by SAP due to Charleston having exceeded its credit limit. (Markowitz Aff. ¶ 7 and Ex. A.). The June 21 Agreement also put in place a mechanism for resolving certain metallurgical claims asserted by Charleston in having rejecting certain orders previously delivered by SAP. (Markowitz Aff. ¶ 8 and Ex. A.).

The June 21 Agreement concluded:

"In summary, it is both Charleston's and SAP's intention to expediate [*sic*] the production, delivery, and payment of the aforementioned orders. In order to

2

avoid any additional problems regarding the production, delivery and payment of this agreement, Charleston will promptly advise SAP of any metalurigical [*sic*] claims or transit damage, and SAP will advise Charleston within seven days of its proposed resolution.  Charleston can not issue its resolution concerning a claim unless thirty days have passed since SAP was advised of such a problem.  This agreement is also designed to eliminate any and all pricing and freight claims which have not be[en] issued to date, and the only claims which can now be issued for previous deliveries are metalurgical [*sic*] claims." (Markowitz Aff. ¶ 9 and Ex. A.).

Thus, it was the intention of the parties that all "pricing and freight claims" arising prior to June 21, 2002 were to be released pursuant to the terms and conditions of the June 21 Agreement.  The only claims arising prior to June 21, 2002, to survive were metallurgical claims for the purchase orders referenced above, which claims were to be resolved pursuant to the procedure set forth in the June 21 Agreement.  (Markowitz Aff. ¶ 10 and Ex. A).

Beginning January 2002, each and every SAP purchase order expressly incorporated certain General Terms and Conditions of Sale.  (Markowitz Aff. ¶ 11 and Ex. B).  Among other things, the General Terms and Conditions of Sale include the following clause, referred to hereinafter as the "Arbitration Clause":

"Arbitration and Law:  With observation of provisions of clause 'BUYER's Claims' of these Terms, the parties agree that: if any dispute, disagreement or demand shall arise, the Parties may refer it to arbitration; before either of the Parties refers any such dispute, disagreement or demand to arbitration, it will first give written notice of such dispute, disagreement or demand to the other, and if any such notice is given, the Parties will confer as soon as practicable and will use all reasonable endeavors to resolve the matter.  With no prejudice to any provisions established by clause 'BUYER's Claims' of these Terms and with their full observation, the Parties agree that if they fail to resolve the matter within the period of 30 days from the date of such written notice, then either

3

Party may refer such matter to arbitration.  <u>Any such disputes arising out of or in connection with the Order and the Terms, including disputes on its conclusion, binding effect, amendment and termination, shall be resolved, to the exclusion of the ordinary courts by an Arbitral Tribunal in accordance with the International Arbitration Rules of the New York Chamber of Commerce.</u>" (Markowitz Aff. ¶ 12 and Ex. B) (emphasis added).

The Arbitration Clause further provided that the "place of arbitration shall be New York" and the dispute "shall be governed by the substantive law of the State of New York."  (Markowitz Aff. ¶ 12 and Ex. B).  All the purchase orders that were subject to the June 21 Agreement were also subject to the Arbitration Clause.

Thus, any disputes arising out of purchase orders executed prior to the June 21 Agreement were resolved pursuant to that agreement, and all disputes arising out of purchase orders executed after that date are subject to the General Terms and Conditions of Sale containing the Arbitration Clause.

Notwithstanding the application of the Arbitration Clause, Charleston filed suit against SAP in South Carolina state court on November 5, 2002.  The Summons and Complaint were served on SAP on November 7, 2002.  Along with the present motion to dismiss and compel arbitration, SAP has filed its Notice of Removal, removing the case to this Court.

4

## III. ARGUMENT

### A.    FEDERAL LAW STRONGLY FAVORS ARBITRATION

Federal law strongly encourages the broad interpretation of written agreements to arbitrate. The purpose of the enactment of the Federal Arbitration Act ("FAA") "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). Thus the FAA "manifest(s) a 'liberal federal policy favoring arbitration agreements.'" Id. at 25 (citation omitted); see also Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24 (1983) (FAA "is a congressional declaration of a liberal policy favoring arbitration"); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985).

The FAA expressly provides that:

> "A written provision in a . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract."
> 9 U.S.C. § 2.

In interpreting this provision, the Supreme Court has directed courts to "rigorously enforce" written arbitration agreements. Byrd, 470 U.S. at 221. "[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the

5

parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Id. at 218 (emphasis in original).

The Court of Appeals for the Fourth Circuit, following the Supreme Court's mandate of vigorously favoring arbitration, has noted that a court "may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Long v. Silver, 248 F.3d 309, 316 (4th Cir. 2001) (citation omitted).[1] The FAA is clear that "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "Because FAA provisions are mandatory, courts must compel arbitration when a valid arbitration agreement exists." Hightower v. GMRI, Inc., 272 F.3d 239, 241 (4th Cir. 2001) (citation omitted).

Moreover, the Supreme Court has stated that the purpose of Sections 3 (providing for a stay of litigation pending arbitration) and 4 (providing for an affirmative order compelling arbitration) of the FAA was "to move the parties to an arbitrable dispute out of the court and into arbitration as quickly as possible." Moses H. Cone, 460 U.S. at 22. Thus the Court

---

[1]    Although the Arbitration Clause contains a New York choice-of-law provision, federal law governs the arbitrability of Charleston's claims. See Smith Barney, Inc. v. Critical Health Sys. of North Carolina, Inc., 212 F.3d 858, 861 n.1 (4th Cir. 2000).

should "call for an expeditious and summary hearing, with only restricted inquiry into factual issues" and refer this matter for arbitration as quickly as possible. Id.

**B.    THE DISPUTE AT ISSUE HERE IS SUBJECT TO ARBITRATION**

The Court must compel arbitration under the FAA when a party can demonstrate the following:

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute. Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991).

When all four requirements are met, the Court must either stay or dismiss the claim in favor of arbitration. See 9 U.S.C. §§ 3-4; Dean Witter Reynolds, 470 U.S. at 218 ("By its terms, the Federal Arbitration Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

All the requirements set forth by the Fourth Circuit in Whiteside are present here.

First, there is clearly a dispute between the parties as evidenced by Charleston's filing suit in South Carolina state court.

Second, a written agreement with an arbitration clause exists and covers the dispute at issue. Charleston, by operation of the June 21 Agreement, released any and all prior claims it had regarding pricing and freight issues. Thus, the only purchase orders in dispute in this action are those that remained to be carried out after the June 21 Agreement. That is, only the purchase orders referenced in the June 21 Agreement remained. Each and every one of those purchase orders expressly incorporated certain General Terms and Conditions of Sale, including the Arbitration Clause. The Arbitration Clause is extraordinarily broad, requiring arbitration of "[a]ny such disputes arising out of or in connection with the Order and the Terms, including disputes on its conclusion, binding effect, amendment and termination." Similar "any dispute" language has been routinely interpreted broadly by courts in applying the FAA and ordering arbitration. See, e.g., Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 398 (1967) (clause requiring arbitration of "any controversy or claim arising out of or relating to this Agreement" was a "broad" arbitration clause); Long, 248 F.3d at 316-17; International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416 n.3 (4th Cir. 2000) (clause requiring arbitration of "[a]ny dispute arising out of the Contract" was a "broad" arbitration clause). The claims asserted in the Complaint all relate to Charleston's purchases of aluminum from SAB pursuant to purchase orders containing the Arbitration Clause. Accordingly, Charleston's claims are subject to arbitration.

Third, the purchase orders clearly relate to interstate commerce as they are contracts for the sale of goods from SAP, a Delaware corporation with its principal place of busi-

ness in New York, and Charleston, a South Carolina corporation.  See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265 (1995).

Fourth, by filing this action in South Carolina state court in the face of the clear Arbitration Clause, Charleston has failed to arbitrate the dispute.

The burden on the opponent of arbitration is heavy.  Unless the opponent of arbitration presents "forceful evidence of a purpose to exclude the claim," the Court must grant a motion to compel arbitration.  United Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 584-85 (1960).  Consistent with this mandate of the FAA, the Supreme Court, and the Fourth Circuit, this Court routinely has compelled arbitration of claims that fall within a valid arbitration agreement.  See, e.g., Reese v. Commercial Credit Corp., 955 F. Supp. 567 (D.S.C. 1997) (granting motion to dismiss and to compel arbitration); Hinson v. Jusco Co., Ltd., 868 F. Supp. 145 (D.S.C. 1994) (granting stay of judicial proceedings pending arbitration); Cherry v. Wertheim Schroder & Co., 868 F. Supp. 830 (D.S.C. 1994) (granting stay of judicial proceedings pending arbitration).

Likewise, the Court here should enforce Charleston's straightforward agreement to arbitrate claims arising from or in connection with its purchase of aluminum products from SAP pursuant to the General Terms and Conditions of Sale and grant SAP's motion to dismiss the Complaint.  When, as here, the entire dispute is subject to arbitration, dismissal of the complaint is appropriate under the FAA.  See Choice Hotels International, Inc. v. BSR Tropi-

9

cana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001) ("Notwithstanding the terms of § 3 [of

the FAA], . . . dismissal is a proper remedy when all of the issues presented in a lawsuit are

arbitrable.") (citation omitted); Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164

(5th Cir. 1992); Sparling v. Hoffman Construction Co., 864 F.2d 635, 638 (9th Cir.1988);

Gibbs v. PFS Investments, Inc., 209 F. Supp. 2d 620, 628 (E.D. Va. 2002); Dancu v. Coopers

& Lybrand, 778 F. Supp. 832, 835 (E.D. Pa. 1991); Hoffman v. Fidelity and Deposit Co., 734

F. Supp. 192, 195 (D.N.J. 1990); Sea-Land Service Inc. v. Sea-Land of P.R., Inc., 636 F.

Supp. 750, 757 (D.P.R. 1986); see also Austin v. Owens-Brockway Glass Container, Inc., 78

F.3d 875, 878 (4th Cir. 1996) (noting that a "valid agreement to arbitrate future disputes ef-

fectively ousts a court of jurisdiction").

In the alternative, if this action is not dismissed, the FAA requires the Court to

stay this litigation pending resolution of the arbitration. The FAA is clear that, "upon being

satisfied that the issue involved in such suit or proceeding is referable to arbitration under . . .

an agreement," the Court "shall on application of one of the parties stay the trial of the ac-

tion." 9 U.S.C. § 3. Thus, the FAA's "stay-of-litigation provision is mandatory" and a dis-

trict court "has no choice but to grant a motion for arbitration where a valid arbitration agree-

ment exists and the issues in a case fall within its purview." Adkins v. Labor Ready, Inc., 303

F.3d 496, 500 (4th Cir. 2002).

10

## IV. **CONCLUSION**

For the foregoing reasons the Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and compel arbitration. In the alternative, the Court should stay these proceeding pending arbitration.

Dated this _6th_ day of December, 2002.

Respectfully submitted,

By: _____

Donald A. Cockrill (Fed Id. # 192)
James T. Hedgepath (Fed. Id. # 7837)
Attorneys for Defendant

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
1501 Main Street, Suite 600
Post Office Box 11206
Columbia, South Carolina 29201
(803) 252-1300

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

DEC - 6 2002

LARRY W. PROPES, CLERK
COLUMBIA, S.C.

- - - - - - - - - - - - - - - - - - - - - - - - - x

CHARLESTON ALUMINUM TRADING CO.,      :
LLC,
                                       :        5 02 4090 24
              Plaintiff,               :

                                       :   No.
       - against -
                                       :

SIBIRSKY ALUMINUM PRODUCTS USA         :
CORP.,
                                       :
              Defendant.               :

- - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF BRUCE MARKOWITZ IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) AND TO COMPEL ARBITRATION

STATE OF NEW YORK            )
                             : ss.:
COUNTY OF WESTCHESTER        )

BRUCE MARKOWITZ, being first duly sworn, deposes and says:

1.    I am the President of defendant Sibirsky Aluminum Products USA

Corp. ("SAP").

2.    I submit this affidavit in support of SAP's motion to dismiss the action

pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and to compel arbitration.

3.     SAP is incorporated under the laws of the State of Delaware with its principal place of business at 550 Mamaroneck Avenue, Harrison, New York, 10528.

4.     This action asserts claims arising from and in connection with the purchase of aluminum products from SAP by plaintiff Charleston Aluminum Trading Co. ("Charleston").

5.     On June 21, 2002, SAP and Charleston entered into an agreement (the "June 21 Agreement") in an "effort to resolve the outstanding issues" between the parties. I was present at the June 21, 2002 meeting at which the June 21 Agreement was negotiated, agreed to, and executed. William Portnoy of Charleston attended the meeting and signed the June 21 Agreement on behalf of Charleston. Attached hereto as <u>Exhibit A</u> is a true and correct copy of the June 21 Agreement.

6.     The June 21 Agreement sets forth various terms and conditions with respect to payment and delivery of Charleston's outstanding orders for the purchase of aluminum pursuant to the following purchase orders, all of which are explicitly referenced in the Agreement:

| Charlston Purchase Order Number | SAP Date of Order | Actual Total Price |
| --- | --- | --- |
| 2199W | February 25, 2002 | $45,121.01 |
| 2226W | February 25, 2002 | $42,474.10 |
| 2227W | February 25, 2002 | $39,262.46 |
| 2228W | February 25, 2002 | $38,439.31 |

| | | |
|---|---|---|
| 2229W | February 25, 2002 | $36,366.33 |
| 2230W | February 25, 2002 | $31,903.78 |
| 2231W | February 25, 2002 | $34,162.65 |
| 2232W | February 25, 2002 | $38,439.31 |
| 2200E | February 22, 2002 | $31,000.50 |
| 2216E | February 22, 2002 | $40,309.92 |
| 2217E | February 22, 2002 | $34,732.32 |
| 2218E | February 22, 2002 | $36,975.91 |
| 2219E | February 22, 2002 | $32,063.85 |
| 2220E | February 22, 2002 | $36,019.22 |
| 2221E | February 22, 2002 | $32,860.15 |
| 2222E | February 22, 2002 | $39,622.80 |
| 2223E | February 22, 2002 | $17,389.05 |
| 2224E | February 25, 2002 | $36,996.77 |
| 2225E | February 25, 2002 | <u>$32,417.76</u> |

**TOTAL:**                                                    $676,557.20

7.      In addition, the June 21 Agreement contemplated that SAP would accept an additional purchase order from Charleston, Order No. 2206, that had previously been rejected by SAP due to Charleston having exceeded its credit limit. As contemplated by the June 21 Agreement, the following additional purchase orders were thereafter accepted by SAP:

| Charleston Purchase Order Number | SAP Date of Order | Estimated Value |
|---|---|---|
| 2206E-S(1) | August 8, 2002 | $46,000 |
| 2206E-BK(1) | August 9, 2002 | $92,400 |
| 2206-W | August 9, 2002 | $52,000 |
| 2206W-BK(1) | August 9, 2002 | $146,200 |
| **TOTAL:** | | $336,600 |

8.    The June 21 Agreement also put in place a mechanism for resolving certain metallurgical claims asserted by Charleston in having rejecting prior orders delivered by SAP:

| Charleston Purchase Order Number | Charleston Date of Order | Actual Total Price |
|---|---|---|
| 2114 - Orangeburg | February 9, 2001 | $199,240.64 |
| 2135 - Pico Rivera | May 22, 2001 | $187,942.84 |
| 2136 - Orangeburg | May 22, 2001 | $147,900.19 |

9.    The June 21 Agreement concluded:

"In summary, it is both Charleston's and SAP's intention to expediate [*sic*] the production, delivery, and payment of the aforementioned orders.  In order to avoid any additional problems regarding the production, delivery and payment of this agreement, Charleston will promptly advise SAP of any metalurigcal [*sic*] claims or transit damage, and SAP will advise Charleston within seven days of it's [*sic*] proposed resolution.  Charleston can not issue it's [*sic*] resolu-

-4-

tion concerning a claim unless thirty days have passed since SAP was advised of such a problem. <u>This agreement is also designed to eliminate any and all pricing and freight claims which have not be[en] issued to date, and the only claims which can now be issued for previous deliveries are metalurgical [*sic*] claims.</u>" (emphasis added)

10.    Thus, it was the intention of the parties that all "pricing and freight claims" arising prior to June 21, 2002 were to be released pursuant to the terms and conditions of the June 21 Agreement. The only claims arising prior to June 21, 2002 to survive were metallurgical claims for the purchase orders referenced in Paragraph 8 above, which claims were to be resolved pursuant to the procedure set forth in the June 21 Agreement.

11.    Beginning January 2002, all purchase orders incorporated certain General Terms and Conditions of Sale. Attached hereto as <u>Exhibit B</u> is a true and correct copy of the General Terms and Conditions of Sale incorporated into every such purchase order.

12.    Among other things, the General Terms and Conditions of Sale provided that:

"<u>Arbitration and Law:</u> With observation of provisions of clause 'BUYER's Claims' of these Terms, the parties agree that: if any dispute, disagreement or demand shall arise, the Parties may refer it to arbitration; before either of the Parties refers any such dispute, disagreement or demand to arbitration, it will first give written notice of such dispute, disagreement or demand to the other, and if any such notice is given, the Parties will confer as soon as practicable and will use all reasonable endeavors to resolve the matter. With no prejudice to any provisions established by clause 'BUYER's Claims' of these Terms and with their full observation, the Parties agree that if they fail to resolve the matter within the period of 30 days from the date of such written notice, then either Party may refer such matter to arbitration. <u>Any such disputes arising out of or in connection with the Order and the Terms, including disputes on its conclusion, binding effect, amendment and termination, shall be resolved, to the exclusion of the ordinary courts by an Arbitral Tribunal in accordance with the</u>

<u>International Arbitration Rules of the New York Chamber of Commerce</u>."  (the "Arbitration Clause") (emphasis added)

The Arbitration Clause further provided that the "place of arbitration shall be New York" and

the dispute "shall be governed by the substantive law of the State of New York."

      13.    Each of the Purchase Orders that were the subject of the June 21

Agreement and are referenced in Paragraphs 6 & 7 above was subject to the General Terms

and Conditions of Sale containing the Arbitration Clause.

                                                                      _____
                                                                  BRUCE MARKOWITZ

Sworn to before me this
_____ day of December, 2002

_____
                Notary Public

JAMES GLUCKSMAN
Notary Public, State of New York
No. 01GL4735410
Qualified in Orange County
Commission Expires November 30, 20__

6/21/02 / SAP OFFICES IN HARRISON NEW YORK

ATTENDES:     ELENA TOLCHENNIKOVA
              ALEXANDER PAVLENKO
              BRUCE MARKOWITZ
              WILLIAM PORTNOY

IN AN EFFORT TO RESOLVE THE OUTSTANDING ISSUES BETWEEN SAP AND CHARLESTON ALUMINUM, BOTH PARTIES HEREBY AGREE TO THE FOLLOWING POINTS:

1)  SAP WILL REDUCE CHARLESTON ALUMINUM'S OPEN 30 DAY CREDIT LINE FROM $500,000.00 TO $150,000.00.  UNDER THIS NEW CREDIT LINE, SAP WILL DELIVER ALL OF THE MATERIAL (EACH SPECIFIC ITEM WITHIN +/- 10%) OF CHARLESTON'S OUTSTANDING PURCHASE ORDERS.  THIS AGREEMENT IS BASED ON OUR MEETING OF TODAY CONCERNING CHARLESTON PURCHASE ORDERS 2199W AND 2226W – 2232W FOR WEST COAST DELIVERY AND 2200E AND 2216E – 2225E FOR EAST COAST DELIVERY (SAP CONFIRMATION FOR THESE ORDERS RECEIVED TO DATE ARE USO2538 – USO2556).  PURCHASE ORDER 2206E AND 2206W WILL HAVE THE SAP CONFIRMATIONS FORWARDED UNDER THE TIMETABLE OUTLINED IN POINT 5 BELOW, AS THEY ARE AN INTEGRAL PART OF THIS ENTIRE AGREEMENT.

2)  IN ORDER TO FACILITATE THE MOVEMENT OF MATERIAL WHICH HAS ARRIVED OR WILL BE ARRIVING IN THE UNITED STATES AS QUICKLY AS POSSIBLE UNDER PURCHASE ORDERS 2199W AND 2226W – 2232W AND 2200E AND 2216E – 2225E AND 2206E AND 2206W, CHARLETSON WILL HAVE THE ABILITY TO PAY FOR MATERIAL WITHIN FIVE BUSINESS DAYS OF IT'S ARRIVAL (AND CHARLESTON'S ACCEPTANCE OF MATERIAL IN GOOD COMMERCIAL CONDITION) AT CHARLESTON'S WAREHOUSE AT A PRICE DISCOUNT OF 1%.  BASED ON SAP FORWARDING THE BREAKDOWN OF MATERIAL CURRENTLY AVAILABLE FOR IMMEDIATE DELIVERY TO CHARLESTON BEFORE 3:00 P.M. ON MONDAY JUNE 24TH 2002, CHARLESTON WILL ADVISE SAP BEFORE 6:00 P.M. ON MONDAY JUNE 24TH 2002, WHAT MATERIAL SHALL BE DELIVERED TO CHARLESTON'S WAREHOUSE OR WAREHOUSES ON TUESDAY MORNING JUNE 25TH 2002.  BASED ON THIS TIMING, CHARLESTON AGREES TO ACCEPT THIS PRICE DISCOUNT AND WORK WITHIN THIS CREDIT LINE ON THE BASIS THAT IT WILL ACCEPT NO LESS THAN THREE CONTAINERS PER WEEK.  THIS UNDERSTANDING IS BASED ON SAP ADVISING THAT MATERIAL IS AVAILABLE FOR PROMPT DELVERY TO CHARLESTON'S DESIGNATED WAREHOUSES.  TO AVOID ANY DATE CONFUSION, CHARLESTON AND SAP WILL USE THE DATE THAT BOTH THE MATERIAL AND THE PAPERWORK (THE MILL TEST CERTIFICATION,

**Exhibit A**

THE MILL PACKING LIST, AND THE SAP INVOICE) ARRIVES AT CHARLESTON'S FACILITIES, BUT IT IS UNDERSTOOD THAT UNTIL BOTH THE MATERIAL AND THE PAPERWORK ARRIVES, THE PARTIES WILL NOT BEGIN TO COUNT THE OPEN NET 30 OR DISCOUNTED NET 5 DAYS.

3) WITH REGARD TO PRICING AND FREIGHT CLAIMS, THE LME PRIC-ING CLAIMS HAVE BEEN ACCEPTED BY SAP, BUT CHARLESTON WILL RETRACT FREIGHT CLAIMS OF $52,000.00 WHICH HAVE BEEN ENTERED TO DATE. THE RETURN OF THE FREIGHT RELATED FUNDS TO SAP WILL BE SENT TO SAP ON A MONTHLY BASIS (STARTING IN JULY) OF $7,500.00 TO $10,000.00. HOWEVER, IT IS CHARLESTON'S INTENTION TO HAVE ALL OF FREIGHT FUNDS PAID BACK TO SAP BEFORE AUGUST 31ST 2002. THIS INTENTION IS BASED ON SAP ACTING IN GOOD FAITH AND MAKING SURE THAT MATERIAL WHICH HAS ARRIVED IN THE UNITED STATES WHICH CORRESPONDS TO THE ORDERS OUTLINED IN POINT NUMBERS 1 AND 2 ABOVE WILL BE PRODUCED AND DELIVERED AS EXPEDITIOUSLY AS POSSIBLE.

4) FOR ALL MATERIAL DELIVERED TO CHARLESTON FOR THESE OUT-STANDING ORDERS (OUTLINED IN POINTS 1 AND 2), CHARLESTON HEREBY AGREES TO NOT ISSUE ANY FREIGHT CLAIMS FOR LATE DELIVERIES OR PARTIAL DELIVERIES. HOWEVER, CHARLESTON DOES RETAIN THE RIGHT TO AT ANY TIME PRIOR TO DELIVERY OF MATERIAL TO CHARLESTON TO CANCEL ANY ITEM OR ITEMS WHICH WERE ORDERED FOR SPECIFIC CUSTOMERS UNDER PURCHASE ORDERS 2199W - 2232W AND 2200E - 2225E DUE TO CHARLESTON'S CUSTOMER'S CANCELLATION.

5) MATERIAL WHICH HAS NOT YET BEEN ENTERED INTO THE SAP PRODUCTION SCHEDULE FOR CHARLESTON PURCHASE ORDERS OUTLINED IN POINTS 1 AND 2 WILL BE PRIORITIZED BY CHARLESTON BY THE ALLOCATED QUANTITY PER PRODUCTION MONTH (AS ADVISED BY SAP) FROM AUGUST 2002 THROUGH FEBRUARY 2003. SAP WILL ADVISE CHARLESTON OF THE ALLOCATED QUANTITY PER PRODUCTION MONTH NO LATER THAN CLOSE OF BUSINESS ON JUNE 28TH 2002, AND CHARLESTON WILL RELEASE IT'S PRIORITIZATION NO LATER THAN CLOSE OF BUSINESS ON JULY 5TH 2002.

6) AT SAP'S EXPENSE, CHARLESTON WILL HIRE AN INDEPENDENT SURVEYOR WITH EXPERTISE IN ALUMINUM TO EXAMINE THE ALUMINUM TUBE PRODUCED UNDER CHARLESTON'S THREE PURCHASE ORDERS (2114, 2135, AND 2136). THESE PURCHSE ORDERS WERE RELEASED UNDER SAP INVIOCES 4913, 4945, AND 4982 (WHICH TOTAL ABOUT $152,000.00 AND/OR 152,000 LBS). IF ALL OF THE

ALUMINUM TUBE PRODUCED FULLY CONFORMS TO CHARLESTON'S ORDER AND THE UNITED STATES ALUMINUM ASSOCIATION'S (LATEST EDITION'S (YEAR 2000)) STANDARDS AND DATA IN ALL RESPECTS, CHARLESTON WILL WITHDRAW IT'S REJECTION OF THIS MATERIAL AND SAP CAN REDELIVER AND RESUBMIT IT'S INVOICES TO CHARLESTON. IN TURN, IF ANY OF THE THREE CHARLESTON TUBE ORDERS HAS A MINIMUM OF 50% CONFORMING MATERIAL, CHARLESTON WILL ACCEPT ALL OF THE MATERIAL WHICH DOES IN FACT CONFORM WITH THAT ORDER. HOWEVER, IF LESS THAN 50% OF THE MATERIAL OF EACH ORDER FAILS TO CONFORM, CHARLESTON AND SAP MUTUALLY AGREE THAT THE ENTIRE ORDER AND ORDERS ARE REJECTED AND CHRALESTON IS UNDER NO OBLIGATION TO ACCEPT ANY MATERIAL WHICH HAS BEEN PRODUCED FOR SAID ORDER OR ORDERS.

7) WHILE WE DID NOT SPECIFICALLY DISCUSS PURCHASE ORDER 2156E, IT IS UNDERSTOOD THAT ALL OUTSTANDING MATERIAL ASSOCIATED WITH THIS ORDER WILL BE SUBJECT TO THE SAME TERMS AND CONDITIONS AS THIS AGREEMENT WAS DRAWN TO ADDRESS.

IN SUMMARY, IT IS BOTH CHARLESTON'S AND SAP'S INTENTION TO EXPEDIATE THE PRODUDUCTION, DELIVERY, AND PAYMENT OF THE AFORE-MENTIONED ORDERS. IN ORDER TO AVOID ANY ADDITIONAL PROBLEMS REGARDING THE PRODUCTION, DELIVERY AND PAYMENT OF THIS AGREEMENT, CHARLESTON WILL PROMPTLY ADVISE SAP OF ANY METALURIGICAL CLAIMS OR TRANSIT DAMAGE, AND SAP WILL ADVISE CHARLESTON WITHIN SEVEN DAYS OF IT'S PROPOSED RESOLUTION. CHARLESTON CAN NOT ISSUE IT'S RESOLUTION CONCERNING A CLAIM UNLESS THIRTY DAYS HAVE PASSED SINCE SAP WAS ADVISED OF SUCH A PROBLEM. THIS AGREEMENT IS ALSO DESIGNED TO ELIMINATE ANY AND ALL PRICING AND FREIGHT CLAIMS WHICH HAVE NOT BE ISSUED TO DATE, AND THE ONLY CLAIMS WHICH CAN NOW BE ISSUED FOR PREVIOUS DELIVERIES ARE METALURGICAL CLAIMS.

As mutually agreed between
Charleston / SAP / SAP Supplier

## General Terms and Conditions of Sale
### (integral part of the Purchase Order)

**Preamble**

Via signing of the Purchase Order shown on the face hereof (hereinafter referred to as "Order"), the BUYER and the SELLER as they are specified in the Order (together the SELLER and the BUYER hereinafter referred to as "the Parties" and separately – "the Party), agree and acknowledge that these General Terms and Conditions of sale and purchase relationship between the SELLER and the BUYER are specified in the Order (hereinafter referred to as "Terms") as such Terms are specified below shall be *mutatis mutandis* an integral and inherent part of the Order and shall have the same binding effect for both the SELLER and the BUYER. In the Order and in these Terms, except to the extent the context otherwise requires or as is otherwise expressly stipulated: the headings of the Order and of the Terms are for ease of reference only and shall not affect the interpretation of the Terms and/or Order; words denoting any one gender include all other genders and words denoting the singular shall include the plural and vice versa; a reference to a "clause" or a "schedule" is a reference to a clause of or a schedule to these Terms or the Order. References to any English legal term for any action, remedy, method or judicial proceeding, legal document, legal status, court, official or any legal concept or thing in respect of any jurisdiction other than Switzerland is deemed to include what most nearly approximates in that jurisdiction to the Swiss legal term. All and any terminology used by the Parties in the Order on the face hereof is construed in the same meaning as it is specified or implied to mean in these Terms.

**1. Recital**

The SELLER wishes to sell the goods specified in the Order which is on the face hereof (hereinafter referred to as "Goods"), and the BUYER wishes to acquire such goods on and subject to the terms and conditions of the Order and these Terms.

**2. Acceptance of the goods**

The Goods sold under the Order are considered to be delivered by the SELLER and accepted by the BUYER together with any and all risks as per the Delivery terms' clause specified in the Order:
- in respect of quality – according to the Inspection Certificate issued by the Producer as it is specified in the Order,
- in respect of quantity – according to the weight and/or number of units stated in the transportation bill CMR or other transportation document (bill of lading, railways bill, etc.) depending on the terms of delivery specified in the Order (hereinafter – "Waybill").
Unless otherwise specified, prices do not include the cost of special containers in which the Goods are packed and shipped. These containers are the property of the SELLER and shall be returned promptly by the BUYER upon the SELLER's request. The property for the Goods (the title) remains with the SELLER until the Goods are considered as paid in the manner as prescribed by clause "Payment" below. All deliveries, mode of transportation, packing, marking of Goods, risks' transfer, etc. Shall be based on the specific delivery term chosen from INCOTERMS, 2000 (issued by the ICC in their publication No560) and agreed upon in each Order. In case of DDU or DDP basis the date of delivery shall be the date of State Customs' stamp on the waybill used, and in case of CIP, CPT, FCA or FOB basis – the date of delivery shall be the date of the waybill accordingly.

**3. Quantity**

In the event that the outturn quantity of Goods does not correspond to the quantity of Goods indicated in respective Waybill, the BUYER shall notify the SELLER and will have the right to submit a claim within ten (10) days after date of delivery of the Goods by the SELLER. A franchise of +/-1% against Waybill's weight will apply on discharge weight and no claim will be made by either the BUYER or the SELLER for any deviation in weight within this franchise.

**4. Quality**

The quality of the Goods shall be in accordance with the standards specified in the Order and shall be confirmed by the Inspection Certificate issued by the Producer.
When the actual quality of the Goods does not correspond to the quality of the Goods indicated in the Inspection Certificate, the BUYER shall notify the SELLER within 30 (thirty) days after the date of delivery of the Goods by the BUYER (in case the claim is submitted on appearance and/or packing) and within 180 (one hundred eighty) days after the date of delivery of the Goods by the BUYER (in case of latent defects are discovered), and within 90 (ninety) days after the date of delivery of the goods by the BUYER (in case of corrosion) and within 3 days should the Goods have been damaged during their transportation.

**5. Payment**

Payment for the goods shall be effected in the United States Dollars. Unless otherwise is communicated by the SELLER to the BUYER. The SELLER's bank account and other requisites are specified in the Order on the face page of these Terms.
The payment shall be effected within 5 (five) working days against presentation by the BUYER of Commercial Invoice (fax copies and originals in triplicate sent via registered mail) unless otherwise stipulated in the Order.
All bank charges related to processing of payments' receipt under the Order and the Terms by the bank of SELLER and the bank-correspondent of the SELLER shall be borne by the SELLER, all and any other charges, fees, commissions, etc. of other banks shall be borne by the BUYER.
The Goods shall be considered as paid upon receipt by the SELLER of the SELLER's bank's notice confirming the receipt of relevant funds equal to the price for the Goods per the Order less the SELLER's bank's charges for the processing of payment to the SELLER's bank account.
Should the BUYER fail to effect payment in due time it will be liable for the agreed liquidated damages calculated at 0,05% of the amount not paid for each day of delay. BUYER's credit shall be subject to SELLER's continuing approval. Buyer will also be liable for any storage and other possible expenses incurred by the Seller should the Buyer be in breach of any of the Terms and/or provisions of the Order. In the event the BUYER's credit position, in the opinion of the SELLER, is unsatisfactory or becomes impaired, the SELLER may require any of the following actions from the BUYER: advance payment (when such payment is not prescribed by the Order for 100% of the price), satisfactory security or a guarantee of prompt payment. Should the BUYER refuse to give payment, security or guarantee agreed and/or required by the SELLER, or if the BUYER is in default in any payment or if any proceedings, voluntary or involuntary are instituted by or against the BUYER in bankruptcy or insolvency or under any provision of the bankruptcy laws of the BUYER's State, or for the appointment of a receiver or trustee or an assignee for the benefit of creditors, the SELLER may cancel the Order, refuse to deliver any undelivered Goods and the BUYER shall immediately become liable to the SELLER for any unpaid price of the Goods delivered, all goods in process of manufacture and for any and all other damages, including loss of reasonable profits caused by such default of the BUYER. In addition to all above damages the SELLER may charge the BUYER interest at the maximum legal rate of interest on unpaid invoices from the due dates thereof, together with all costs of collection including reasonable attorney's fees. The foregoing rights are without prejudice to any other lawful remedy, including without limitation the right to reclaim any goods received on credit by the BUYER while insolvent.

**6. BUYER's Claims**

Any and all claims of the BUYER to the SELLER shall contain the following information which shall include but not limited to:
(a)   Registration Number and the date of the claim;
(b)   Order Number and Item as per Order;
(c)   Description of goods, Alloy, Temper, sizes, and other specific features of the Goods;
(d)   Lot Number, Item Number according to Shipping document (with copies of Shipping document and Inspection Certificate enclosed);
(e)   Carrier description: date and number of the Waybill (CMR, or bill of lading, or other waybill depending on terms of delivery per each Order), trail and truck numbers, or vessel's name, or rail cars' number respectively;
(f)   Invoice Number,
(g)   Date of receipt of Goods;
(h)   Number of shipped packages;
(i)   Gross and net weight as per Shipping documents;
(j)   Outturn weight (for quantity claims);
(k)   Techniques employed when determining outturn weight.
(l)   Quantity of the Goods claimed to be substandard (for quality claims);
(m)   Nature of claim: statement with detailed description of technical conditions or standard requirements infringed (for quality claims);
(n)   Techniques employed when determining the actual quality of the Goods (for quality claims);
(o)   Claim compensation request (delivery of quantity missing, repayment, merchandize return, replacement of the goods, compensation for the losses etc.);
(p)   Compensation amount calculation;
(q)   Supporting documents: photos, technical inspection reports, transport documents, insurance policy etc.
(r)   Executor of the claim/responsible representative, phone number and other contact details.
The BUYER's obligation to pay can not be waived or postponed due to a claim having been presented. Obligation of the SELLER to compensate the BUYER against the claim arises after the claim is proved by the BUYER and accepted by the SELLER. Different claims should be submitted separately for each lot of Goods when they are shipped in lots. After the claim is submitted the BUYER shall not have the right to use the challenged Goods and have to ensure it's proper storage bearing any risks of loss, damage, etc. until the final settlement of the claim.

For this purpose the BUYER is entitled to insure the Goods at its own account with no compensation by the SELLER of such expense. The SELLER is entitled to inspect the Goods the quality and/or the quantity of which is challenged by the BUYER. In this case the BUYER has to ensure reception receipt of the SELLER's representative(s) and afford an opportunity to make inspection of such challenged goods at site. If as a result of negotiations the Parties have not come to a joint resolution of the claim the BUYER upon the written agreement with the SELLER has the right to invite an independent surveyor (to be appointed by the Parties jointly in writing). The decision of the surveyor shall be final and binding for both Parties, but in any case the moment of claim transfer per Incoterms 2000 shall be taken into consideration for defining whether there is the Seller's fault and whether the Buyer's claim is to be satisfied accordingly (without prejudice to other factors as required to be proven/performed by the Buyer. All expenses for the examination of Goods performed by an independent surveyor to be paid by the faulty party. When the claim is considered proved by the BUYER and accepted by the SELLER, the latter is obliged to compensate the BUYER for the suffered losses (the amount and the order of compensation is to be mutually agreed by the Parties hereto in writing subject to provisions of these Terms). Compensation may be executed by any of the following means agreed by the Parties: delivery of quantity missing, repayment of the Goods' price corresponding to the amount of lacking Goods, repair of the Goods (except for the case when such a repair is unreasonable taking into account all the circumstances), substitution of the Goods (should the lack of conformity be the fundamental breach of the Terms and Order), etc. If the SELLER within 30 calendar days does not reply to a claim submitted or does not send it's representative to inspect the challenged Goods the claim is considered to be justified and accepted by the SELLER. No claim with the amount of lower or equal to USD100 (One hundred United States Dollars) is to be considered by the SELLER, and the BUYER waives his right to raise such claims accordingly.

**7. Warranty**

SELLER warrants to BUYER that the Goods delivered will conform to the specification as stated in the Order. The Warranty does not cover and the SELLER makes no warranty with respect to the following:
- defects not reported, and defective items not returned within the 180 day warranty period;
- failures and damages due to misapplication, lack of proper handling, improper installation, abuse, abnormal conditions of temperature, moisture, dirt or corrosive matter at the BUYER's or Consignee's and/or their forwarders agents facilities;
- any expenses incurred by the BUYER or an organization other than the SELLER in attempting to repair, replace or re-work any allegedly defective Goods without the prior consent of the SELLER.
The Warranty stated above is expressly in lieu of all other warranties, including but not limited to any Warranty, express or implied, of merchantability or of fitness and it constitutes the only warranty made with respect to any Order of the Goods covered thereby.

**8. Liability**

The SELLER shall not in any event or under any circumstances be liable for special or consequential damages, including but not limited to, loss of profit or revenue, loss of use, or claims by customers of the BUYER. The remedies for the BUYER on any account or cause whatsoever under or arising out of the Order and the Terms are exclusive and the sum total liability of the SELLER to the BUYER hereunder with respect to any Order, or anything done in connection therewith such as performance, or sale or delivery, re-sale, repair or use of any Goods covered by or furnished under any Order whether in delay, in tort, under any warranty or otherwise, shall not exceed the value of the Goods of each individual Order proved to be defective or short-shipped to the extent the price for such Goods is actually received by the SELLER. The SELLER shall not be liable under any circumstances whatsoever for loss, damage or expense directly or indirectly arising from use of the Goods, nor shall the SELLER be liable for consequential or any other damages with respect to the Order.

**9. Amendments/Modifications**

The Order and/or the Terms may not be supplemented, amended or varied in any manner except by an instrument in writing signed by a duly authorized officer or representative of each of the Parties hereto.

**10. Notices**

Any notice or other communication under or in connection with the Order and the Terms shall be in writing and (unless otherwise agreed in writing) shall be delivered by hand or by a registered mail or by facsimile to the Party due to receive the notice or communication at its address details set out in the Order or to such other address details as the relevant Party may specify by notice in writing to the other Party. Any notice or other communication shall be deemed to have been duly given (a) if delivered by hand when left at the address set out above or (b) if delivered by registered mail, on the date of signature of the courier's receipt or (c) if sent by facsimile, at the expiration of two hours after the time of dispatch as evidenced by a valid answerback.

**11. General conditions**

The Order and the Terms shall be binding upon each Party's successors and assigns. Neither the benefits of the Order and the Terms nor any rights/obligations under the Order and the Terms may be assigned without the prior written consent of the other party. If any term, provision, clause of the Order and/or in the Terms is held to be illegal or unenforceable, in whole or in part, under any enactment or rule or law, such term or provision or part shall to that extent be deemed not to form part of the Order and/or the Terms but the enforceability of the remainder of the Order and/or the Terms shall not be affected. No variation of the Order and/or the Terms shall be valid unless it is in writing and signed by or on behalf of the last of the parties. Should there be any conflict between any of the Order provisions and of the Terms the Order's provisions will prevail.

**12. Force Majeure**

Neither Party will be liable for non-performance or delay in performance not within its control and due wholly or in part to events of force majeure. Events of force majeure include (but not limited to) war, riots, strike, nuclear accident, lockouts, blockade, Acts of God, fire, explosion, flood, confiscation or action of any authority, public body government or governmental agency including Acts of State bodies of the Russian Federation (as the country of Producer). If either Party considers it is impeded by an event of force majeure, it shall only be entitled to claim force majeure if it submits to the other Party immediately or within 5 days at the latest, a Certificate issued by the authorities or the Chamber of Commerce of its country, confirming the reasons, the commencement date and the expected duration and consequences of that event. Failure to provide such Certificate shall exclude the right of that Party to rely on an event of force majeure. In case that the event of force majeure exceeds 90 (ninety) days, the PARTIES will have the right to terminate the Order in whole or in part.

**13. Arbitration and Law**

With observation of provisions of clause "BUYER's Claims" of these Terms, the parties agree that: if any dispute, disagreement or demand shall arise, the Parties may refer it to arbitration; before either of the Parties refers any such dispute, disagreement or demand to arbitration, it will first give written notice of such dispute, disagreement or demand to the other, and if any such notice is given, the Parties will conduct as soon as practicable and will use all reasonable endeavors to resolve the matter. With no prejudice to any provisions established by clause "BUYER's Claims" of these Terms and with their full observation, the Parties agree that if they fail to resolve the matter within the period of 30 days from the date of such written notice, then either Party may refer such matter to arbitration. Any such disputes arising out of or in connection with the Order and the Terms, including disputes on its conclusion, binding effect, amendment and termination, shall be resolved, to the exclusion of the ordinary courts by an Arbitral Tribunal in accordance with the International Arbitration Rules of the New York Chamber of Commerce. The decision of the Arbitral Tribunal shall be final and the parties waive all challenge of the award in accordance with Art. 192 Private International Law Statute. If the said Rules prescribe three arbitrators for a specific case, each Party should appoint one arbitrator and the Chairman of arbitration should be appointed by the President of New York Chamber of Commerce. The place of arbitration shall be the New York (USA). The language to be used in the arbitral proceedings and documents shall be English. These Terms, as well as each Order shall be governed by the substantive law of the State of New York without reference to principles of conflict of laws. Should under the above substantive law the provisions of the United Nations' Vienna Convention on Contracts for the International Sale of Goods dated 1980 apply to the Terms and Order accordingly, they, as well as the Order provisions of the applicable substantive law, will apply to any relationship between the Parties that are not covered by the Order and/or the Terms.

**Exhibit B**